## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

VELMA ROCHA,

    Plaintiff,

v.                                                       CIV. NO. 04-029 WPL

JO ANNE B. BARNHART,
Commissioner of Social Security,

    Defendant.

## MEMORANDUM OPINION AND ORDER[1]

    Velma Rocha applied for disability insurance and supplemental security income benefits in September 1996, asserting that she became disabled on August 1, 1996. [Administrative Record (AR) 24, 68, 83, 92] After an adverse decision by the Commissioner of Social Security, Rocha brought this action for judicial review. [Doc. 1] The matter is before me now on Rocha's Motion to Reverse and Remand for Payment of Benefits, or in the Alternative, for a Rehearing. [Doc. 12] In her memorandum in support of this motion, Rocha argues that the administrative law judge (ALJ) erred by failing to develop the record regarding her mental impairment, by finding that she can return to her past relevant work, and by determining that her complaints were not credible. [Doc. 13 at 5] For the reasons explained below, I will grant the motion in part and remand this matter for further proceedings.

---

[1] In accordance with 28 U.S.C. § 636(c)(1) and FED. R. CIV. P. 73(b), the parties have consented to having me conduct all proceedings and enter a final judgment in this case.

**FACTUAL AND PROCEDURAL BACKGROUND**

*Medical Evidence: Physical Impairments*

Rocha's medical records show a history of deep vein thrombosis (DVT), which required hospitalization in 1990. [AR 149]  There is no medical evidence that she suffered from DVT after that time, although she did suffer from superficial phlebitis on at least one occasion. [AR 300]

Rocha also has a history of chronic back problems. [AR 150, 168]  A medical record and x-rays from 1993 indicate that she has a congenital fusion of the L1-2 anterior vertebral body. [AR 239]

Rocha claims that she injured her back while working as a maid in July 1996. [AR 122]  She was diagnosed as having a lumbosacral sprain. [AR 118]  On examining her back, a doctor noted "moderate scoliosis with concavity of the thoracic spine to the right side and concavity of the lumbar spine to the left . . . mild to moderate limitation in flexion and in extension . . . pain and spasm localized over the posterior iliac crest, left side and into the left buttock and left SI joint as well." [AR 123]  An x-ray revealed "moderate diffuse osteopenia" and "ankylosis of the anterior aspect of the T12 and L1 vertebral bodies with calcified disc."[2]  [AR 125]  The doctor prescribed physical therapy and anticipated a full recovery. [AR 120]  Within a few weeks, the doctor found that Rocha had a full range of motion in her lower back, but she continued to complain of back, shoulder, and arm pain. [AR 118, 168, 172]

In September 1997, Rocha was referred for an EMG consultation to evaluate her nerve conduction.  The consulting physician wrote that Rocha's exam was normal, but she appeared

---

[2] "Osteopenia" refers to decreased calcification or density of bone. STEDMAN'S MEDICAL DICTIONARY 1284 (27th ed. 2000).  "Ankylosis" refers to the stiffening or fixation of a joint as the result of disease. *Id.* at 90.

2

"depressed & apathetic." The physician also wrote, "I see no neuromuscular dysfunction. Appears depressed with chronic illness behavior & motivated for disability rather than recovery." [AR 307]

In December 1997, Rocha was in a car accident, which she claimed exacerbated her back problems. [AR 298, 303] She continued to seek treatment for back pain from 1998 through 2001. [AR 323, 324, 339, 343, 345, 350, 359, 364, 462] During a November 2001 appointment, her primary physician, Dr. Sava, noted "positive spasm in the paraspinous muscles pronounced in the thoracic and upper lumbar regions," and diagnosed "[l]ow back pain - chronic with spasm." [AR 462]

Dr. Sava completed a Physical Limitations Form, stating that based on his medical findings Rocha has a permanent and significant reduction in physical capacity. The diagnosis leading to this conclusion was "LBP" and "H/O spinal stenosis." [AR 488] The form states that Rocha did not have any capacity to lift or carry. It further states that Rocha had the ability to walk and stand for only one hour per day and to sit for only two hours per day; she could never stoop or bend; could reach, push, pull, grasp, and finger occasionally; and could not climb one flight of stairs without pausing. [AR 488] The form also states that Rocha's capacity to use her upper and lower extremities was restricted. [AR 488] However, Dr. Sava noted throughout Rocha's medical records that she was "gen. well." [AR 134, 298, 300, 321, 322, 325, 333, 339, 343, 345, 351, 352, 359, 364]

*Medical Evidence: Mental Impairments*

Rocha has a history of alcohol abuse, but stopped drinking some time before she filed her application for benefits. [AR 270] She also attempted to commit suicide using aspirin some time before 1990. [AR 150] A medical record from 1994 indicates that Rocha was suffering from depression. [AR 182]

In 1997, Rocha began receiving treatment at the University of New Mexico Mental Health

Center (UNMMHC). In August 1997, she was diagnosed with major depressive disorder--single episode and was prescribed Serzone, an antidepressant. *See* MedicineNet.com. Her medical records note that her chronic back problems contributed significantly to her depression. [AR 270, 274, 283] The doctor gave her a score of 55 on the Global Assessment of Functioning (GAF) Scale. [AR 271] This means either that she had moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers). *See* AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. text rev. 2000) [hereafter "DSM-IV-TR"]. She was rated "moderately ill" on the Clinical Global Impression (CGI) Scale, and continued to have this rating through November 1997. [AR 270, 278-82] Although she was not always able to refill her prescription due to lack of money, the Serzone seemed to improve Rocha's condition. [AR 279-80] In December 1997, Rocha was rated as only mildly ill and it was noted that her compliance with Serzone was questionable. [AR 289] Rocha apparently discontinued the Serzone and stopped treatment at UNMMHC because she started feeling better. [AR 411]

Rocha's depression returned in 1999, when she began having relationship and financial problems. [AR 411] In April 1999, Dr. Sava prescribed Trazadone, another antidepressant, *see* MedicineNet.com, but Rocha stopped taking it because it was overly sedating. [AR 348, 413, 415] In June 1999, Dr. Sava again referred Rocha to UNMMHC. [AR 413]

Rocha's June 1999 UNMMHC intake record states that she lost General Assistance Benefits in January 1999 because she was being treated by Dr. Sava rather than a psychiatrist. [AR 413] The intake record also states that she called for a referral in April 1999 and was told that UNMMHC would not treat her for benefits alone. [AR 415] The initial treatment plan includes "R/O

Malingering." [AR 415]

An August 1999 UNMMHC medical record states that Rocha was moderately ill on the CGI Scale. [AR 406] She was prescribed desipramine, an antidepressant, *see* MedicineNet.com, but was noncompliant with that medication. She claimed that when she took the full dosage, she experienced dizziness and an upset stomach. [AR 396-97, 406] From August through October 1999, her GAF scores were in the 55-60 range, and she was rated as moderately ill on the CGI Scale. [AR 402-06]

In November 1999, a doctor at UNMMHC rated her as "markedly ill" on the CGI Scale, noting that she suffered from chronic back pain, an eleven-month depression, and panic attacks. [AR 397] The doctor indicated that she was visibly uncomfortable because of her back pain. [AR 397] A March 2000 medical record states that Rocha had symptoms of post-traumatic stress disorder, including nightmares, flashbacks, hypervigilance, exaggerated startle response, and strong efforts to avoid thinking about the past. [AR 391] Throughout 2001, UNMMHC doctors gave Rocha GAF scores in the 50s. [AR 373-74, 470]

### *Initial Administrative Decisions*

Rocha's application was denied initially, on reconsideration, and after a hearing by an ALJ. [AR 68-80, 315] However, the Appeals Council remanded for a new hearing because the tape of the first hearing was lost. [AR 315]

### *ALJ Vanderhoof's Decision*

After conducting the new hearing, ALJ Vanderhoof determined that Rocha was able to return to her past relevant work and thus was not entitled to benefits. [AR 425-30][3] He first found that Rocha's mental impairments imposed no more than a minimal impact on her capacity to work. [AR

---

[3] The administrative record does not contain a transcription of this hearing.

426]  This finding was based largely on his conclusion that Rocha's allegations were not credible. [AR 426-27]  Furthermore, the evidence indicated that Rocha's mental impairments were mild, and no treating doctor had ever indicated that she experienced any work-related functional restrictions. [AR 427]

The ALJ next found that Rocha retained a residual functional capacity (RFC) that supported light work.  [AR 428]  As with her allegations regarding mental impairments, the ALJ found that Rocha's allegations regarding physical impairments were not credible.  [AR 428]

The Appeals Council remanded the case, concluding that the severity of Rocha's mental impairments required further evaluation.  Among other things, the Appeals Council instructed the ALJ to obtain additional evidence concerning Rocha's mental impairments, including obtaining a consultative examination if warranted, and to give further consideration to Rocha's RFC.  [AR 444-45]

### *ALJ Wurm's Decision*

On remand, ALJ Wurm conducted a new hearing at which Rocha and a vocational expert (VE) testified.

Rocha testified that she was born in 1948 and has a fourth-grade education.  [AR 43, 45] She last worked in August 1996, as a maid, and had previously done maintenance work at the New Mexico State Fair.  [AR 46]  She stated that her back and leg problems keep her from working.  [AR 47]  She testified that she has a "fusion" in her back and it "gets very painful."  She experiences back pain every day.  Usually the pain is only in her lower back, but sometimes it goes from her neck all the way down.  [AR 47-48]  To relieve the pain, she uses "[m]edication, muscle relaxers or Icy Hot, . . . things like that."  Hot showers also provide some relief.  [AR 48]  Rocha additionally claimed that

she has pain in her left leg due to poor circulation. To relieve that pain, she elevates her leg for about half an hour three or four times a week. [AR 48-49] Rocha estimated that she could sit for only half an hour at a time and could stand for only twenty minutes at a time. [AR 54-55] She does not do any lifting, except for taking out the trash, "but it's mostly like papers and plastic bottles, nothing heavy." [AR 56]

Rocha also testified regarding her mental impairments. She stated that she has nightmares about two or three nights a week. [AR 51-52] During the day, she often feels that "bad things are going to happen." [AR 51] She gets sweaty, feels like she has a knot in her stomach and cannot catch her breath, and wants to cry and to run away. [AR 51-52] She experiences these feelings almost every day. [AR 52] She also gets depressed sometimes--meaning she sleeps a lot and does not feel like doing anything. [AR 53] Additionally, Rocha testified that she experiences dizziness about three or four times a week. She believed stress caused the dizzy spells. [AR 50-51] She does not go out much because she is afraid she will get dizzy. [AR 56] At the time of the hearing, she was going to counseling about once a month and was taking medication for her depression and anxiety. [AR 53-54]

ALJ Wurm determined that Rocha could return to her past relevant work as a maid and thus was not entitled to benefits. [AR 23] He incorporated by reference ALJ Vanderhoof's credibility findings. [AR 22] Additionally, because the Appeals Council had not indicated any problem with ALJ Vanderhoof's analysis of Rocha's physical impairments, ALJ Wurm also incorporated that analysis. [AR 22] The only issue ALJ Wurm addressed regarding the physical impairments was the opinion of Dr. Sava, which had been prepared after ALJ Vanderhoof's decision. ALJ Wurm refused to accord significant weight to that opinion because it was not supported by clinical findings or

7

diagnostic testing and was inconsistent with Dr. Sava's statements throughout the record that Rocha was generally well. [AR 22] ALJ Wurm found that Rocha retained an RFC that supports light work and that does not involve working at heights or around hazardous conditions. [AR 22]

Regarding mental impairments, ALJ Wurm found it noteworthy that Rocha had not submitted any opinion from her treating therapists regarding work-related functional restrictions, even though the case had been remanded specifically for evaluation of her mental condition. [AR 22-23] Giving Rocha "the benefit of a doubt," ALJ Wurm concluded that she "experiences moderate restrictions of her ability to adapt to work changes and tolerate work related stressors." [AR 23]

Based on the VE's testimony, ALJ Wurm concluded that Rocha could return to work as a maid. [AR 23] The Appeals Council denied Rocha's request for review of ALJ Wurm's decision, thus making that decision the final decision of the Commissioner. [AR 8] *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000).

### STANDARD OF REVIEW

In reviewing the ALJ's decision, I must determine whether he applied the correct legal standards. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004). The decision must be reversed if the ALJ failed to demonstrate that he applied the correct legal standards. *See id.* I must also determine whether the ALJ's factual findings are supported by substantial evidence in the record. *See id.* Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See id.* A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it. *See id.* I am required to meticulously examine the record to ascertain whether the ALJ's decision is supported by substantial evidence, taking into account whatever in the record fairly detracts from its weight. *See*

*id.* But I may neither reweigh the evidence nor substitute my discretion for that of the ALJ. *See id.*

**SEQUENTIAL EVALUATION PROCESS**

The Social Security Administration has promulgated a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); 20 C.F.R. §§ 404.1520, 416.920. If at any step, a finding of disability or nondisability can be made, the Administration will not review the claim further. At the first step, the claimant must show that she is not working at a substantial gainful activity. At the second step, the claimant must show that she has an impairment that is severe enough to significantly limit her ability to do basic work activities. At the third step, the claimant must show that the impairment meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. At the fourth step, the claimant must show that she is unable to perform the work she has done in the past. At the fifth step, the Commissioner must show that the claimant is capable of performing other jobs existing in significant numbers in the national economy. *Barnhart*, 540 U.S. at 24-25; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail).

In this case, the ALJ denied benefits at step four. This step is comprised of three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). In the first phase, the ALJ must evaluate the claimant's RFC. In the second phase, he must determine the physical and mental demands of the claimant's past relevant work. In the third phase, he must determine whether the claimant has the ability to meet the job demands found in phase two despite the limitations found in phase one. *Id.*[4]

---

[4] Rather than following the format of Rocha's memorandum, I will first address her arguments that relate to phase one of step four and then address her arguments that relate to phase two. Moreover, I will not address her argument that ALJ Wurm failed to comply with the instructions in the Appeals Council's remand order because I do not have jurisdiction to enforce the Appeals Council's order. *See Gallegos v. Apfel*, No. 97-2267, 1998 WL 166064, at **1 (10th Cir. April 10, 1998) (unpublished). Rocha argues that

**CONSULTATIVE EXAMINATION**

Rocha argues that ALJ Wurm should have further developed the record regarding her mental impairments. Specifically, Rocha argues that ALJ Wurm should have obtained a consultative examination. She asserts that the ALJ improperly shifted the burden to her to develop evidence regarding her mental impairments.

Although the claimant has the burden of proving disability, the ALJ has a duty to develop an adequate record upon which the disability decision may be made. *Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997). In executing this duty, the ALJ has broad latitude in ordering a consultative examination. *Id.* at 1166. The Tenth Circuit has held that "the ALJ should order a consultative exam when evidence in the record establishes the reasonable possibility of the existence of a disability and the result of the consultative exam could reasonably be expected to be of material assistance in resolving the issue of disability." *Id.* at 1169. However:

> [W]hen the claimant is represented by counsel at the administrative hearing, the ALJ should ordinarily be entitled to rely on the claimant's counsel to structure and present [the] claimant's case in a way that the claimant's claims are adequately explored. Thus, in a counseled case, the ALJ may ordinarily require counsel to identify the issue or issues requiring further development. In the absence of such a request by counsel, we will not impose a duty on the ALJ to order a consultative examination unless the need for one is clearly established in the record.

*Id.* at 1167-68 (citation omitted).

Rocha's counsel did not ask the ALJ to order a consultative examination. ALJ Wurm asked counsel at the beginning of the hearing whether counsel had a chance to review the file. When she

---

some of the ALJ's failures to follow the Appeals Council's instructions also constitute failures to apply correct legal standards. I will address this aspect of her arguments. *Cf. id.* ("Plaintiff does not argue that the ALJ failed to adhere to a legal requirement . . . in reaching her second, final decision, but only that the ALJ did not follow the Appeals Council's direction. Therefore, plaintiff's first issue is not within our jurisdiction.").

responded that she had, the ALJ asked, "Is there anything additional needed?" Counsel answered, "No there's not, Your Honor." [AR 44] It is difficult to fault the ALJ for failing to order a consultative examination when Rocha's own counsel affirmatively indicated that the file was complete.

Moreover, this is not a case in which the administrative record lacks evidence regarding the mental impairments. As summarized above, the administrative record contains extensive medical records by the doctors who treated Rocha for depression and anxiety. Under these circumstances, I cannot conclude that the need for a consultative examination was clearly established by the record.

### CREDIBILITY AND MENTAL IMPAIRMENTS

Rocha asserts that the ALJ erred in finding that her complaints regarding mental impairments lacked credibility. In particular, she argues that he erred in determining that she was motivated by secondary gain, in relying on her failure to take medication, and in failing to consider her GAF scores.

Judging credibility is "peculiarly the province" of the ALJ. *Diaz v. Sec'y of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990). Nevertheless, a credibility determination must be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of a finding. *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995). Although I must ordinarily defer to the ALJ on questions of credibility, such deference is not an absolute rule. *See Thompson v. Sullivan*, 987 F.2d 1482, 1490 (10th Cir. 1993).

ALJ Wurm found that the evidence "strongly suggests that [Rocha] seeks mental health counseling because that is the requirement for eligibility for welfare assistance." [AR 23] He also incorporated ALJ Vanderhoof's findings to the same effect. [AR 22, 426-27] Despite Rocha's assertion to the contrary, these findings are supported by substantial evidence. One of her doctors

11

believed that she was motivated for disability. The record indicates that she essentially stopped mental health treatment in 1998, and only returned to it after her general assistance benefits were terminated. She informed the UNMMHC staff that she lost those benefits because she was not in psychiatric care. UNMMHC's initial treatment plan included ruling out malingering. Because the ALJs' credibility findings are affirmatively linked to substantial evidence, I must defer to them. *See Bean v. Chater*, 77 F.3d 1210, 1214 (10th Cir. 1995) (upholding ALJ's finding that claimant exaggerated her symptoms where claimant's first report of disabling symptoms occurred when her welfare benefits were set to expire); *Diaz*, 898 F.2d at 777 (upholding ALJ's negative credibility finding where there was evidence that a consulting physician suspected claimant of malingering).

ALJ Wurm found that Rocha "has a history of medical noncompliance." [AR 23] He also incorporated ALJ Vanderhoof's findings regarding Rocha's failure to take her medications. [AR 427] Rocha argues that the ALJs should not have counted this against her because she could not always afford her medications and she suffered from side effects of the medications.

An ALJ may rely on a claimant's failure to take prescribed medication in determining that the claimant is not credible. *See Thompson*, 987 F.2d at 1490. But side effects and indigence may justify a claimant's failure to take prescribed medications. *See id.* at 1489-90; *Frey v. Bowen*, 816 F.2d 508, 517 (10th Cir. 1987).

ALJ Vanderhoof acknowledged, but rejected, Rocha's claims that she could not afford some of her medicines and that others gave her unpleasant side effects. He stated:

> Although she alleges that she has been unable to afford medications, there is no evidence that she has sought either free or low cost medication, or that she was ever refused medications or medical care because of inability to pay. . . . . She has discontinued her medications on her own because of undesired side effects. However, she does not state that she requested different medications without those side effects. [AR 427]

12

It was permissible for the ALJ to consider the lack of evidence that Rocha had sought free or low-cost medication or had been refused medication because of inability to pay. *See Murphy v. Sullivan*, 953 F.2d 383, 386-87 (8th Cir. 1992) (upholding ALJ's determination that claimant's financial hardship did not justify failure to seek medical treatment, based partly on lack of evidence that she sought low-cost treatment or that she had been denied care because of her financial condition); *see also Allen v. Apfel*, No. 99-3249, 2000 WL 796081, at **3 (10th Cir. June 21, 2000) (unpublished) (citing *Murphy* and noting that the "record contains no evidence plaintiff sought medical treatment . . . , but was refused for an inability to pay").

Regarding side effects, Rocha points out that there is evidence that she reported side effects of medications to her doctors and that her doctors changed her medications in response to those complaints. [*E.g.* AR 392] But there is also more than a scintilla of evidence that Rocha may have discontinued some medications without seeking an alternative from her doctors. [*E.g.* AR 396, 413][5]

Regarding her GAF scores, Rocha argues that her treating doctors must have believed that her mental impairments had an adverse effect on her functioning because they consistently gave her GAF scores in the 50s. As noted above, a GAF score from 51 to 60 indicates either moderate symptoms or moderate difficulty in social, occupational, or school functioning. DSM-IV-TR at 34. Thus, a GAF score in the fifties does not necessarily indicate an impairment that seriously interferes with a person's ability to work. For example, the impairment might be solely in the social field, instead of the occupational field. *See Lee v. Barnhart*, 117 Fed. Appx. 674, 678 (10th Cir. 2004)

---

[5] Even if the ALJ erred by finding that Rocha discontinued her medications on her own instead of seeking different medications without side effects, this finding was at most harmless error because the credibility finding was otherwise supported by the substantial evidence regarding secondary gain. *See Foster v. Chater*, No. 95-7049, 1995 WL 694132, at **2 (10th Cir. Nov. 24, 1995) (unpublished).

(unpublished). I also note that the ALJ did not completely reject Rocha's claim that her mental impairments affected her ability to work. He found that she experiences moderate limitations of her capacities to adapt to work changes and to tolerate work stressors.

### PAIN AND CREDIBILITY

Rocha asserts that the ALJ failed to apply the proper analysis in determining whether her complaints of pain were credible. An ALJ's evaluation of a claimant's subjective complaints of pain necessarily turns on an assessment of the claimant's credibility. *White v. Barnhart*, 287 F.3d 903, 909 (10th Cir. 2001). Subjective allegations of pain are not sufficient to establish disability. The ALJ need not even consider subjective allegations unless the claimant first proves, by objective medical evidence, the existence of a pain-producing impairment that could reasonably be expected to produce the alleged disabling pain. *Thompson*, 987 F.2d at 1488. Accordingly, when a claimant alleges disabling pain, the ALJ should apply a three-step analysis: 1) whether the claimant established a pain-producing impairment by objective medical evidence; 2) if so, whether there is a loose nexus between the proven impairment and the claimant's subjective allegations of pain; and 3) if so, whether considering all the evidence, both objective and subjective, the claimant's pain is in fact disabling. *Kepler*, 68 F.3d at 390. At the third step, the ALJ should consider several factors to determine the credibility of the claimant's subjective allegations of pain. The factors include: the duration, frequency, and intensity of the pain; the levels of medication and its side effects; the extensiveness of the attempts to obtain relief; the frequency of medical contacts; the nature of daily activities; subjective measures of credibility that are peculiarly within the judgment of the ALJ; and the consistency of nonmedical testimony with objective medical evidence. *Hamlin*, 365 F.3d at 1220; *Thompson*, 987 F.2d at 1489.

ALJ Wurm did not address Rocha's complaints of pain. Instead, he incorporated ALJ Vanderhoof's analysis. [AR 22] I must therefore turn to ALJ Vanderhoof's decision to determine whether Rocha's complaints of pain were properly analyzed.

ALJ Vanderhoof detailed his reasons for finding that Rocha's complaints of leg, shoulder, and arm pain were not credible. [AR 428] Regarding Rocha's complaints of back pain, he wrote:

> As for her back symptoms, I find it noteworthy that the claimant did not testify to any significant back problem, but instead complained of her mental condition and problems with her left leg and left upper extremity and shoulder. This is interesting because the claimant's doctor has treated her only for back symptoms on a regular basis and has not diagnosed any other persisting condition. It is also noteworthy that although the claimant has received treatment for back pain, no diagnostic testing has been conducted in order to confirm any back condition reasonably expected to cause her back symptoms, and the record contains very few clinical findings which would substantiate significant back pain. [AR 429]

Because the administrative record does not contain a transcription of the hearing conducted before ALJ Vanderhoof, I cannot review his statement that Rocha did not testify to any significant back problem at that hearing. At the hearing before ALJ Wurm, however, Rocha testified that her back and leg problems keep her from working, that she has a "fusion" in her back that "gets very painful," and that she experiences back pain every day. [AR 47-48]

Based apparently on his belief that Rocha was not claiming significant back pain, ALJ Vanderhoof's analysis of this issue was perfunctory. Although he stated that "no diagnostic testing has been conducted in order to confirm any back condition reasonably expected to cause her back symptoms," he did not mention the objective medical evidence that Rocha has scoliosis and ankylosis in her thoracic and lumbar regions and that physicians noted spasms in those regions. This evidence

15

satisfies the first two steps of the three-step analysis. *See Thompson*, 987 F.2d at 1489.[6] The Commissioner does not argue otherwise in her memorandum in opposition to Rocha's motion to reverse and remand. Therefore, the ALJ was required to consider Rocha's allegations of pain and "'decide whether he believe[d them].'" *Id.* (quoting *Luna v. Bowen*, 834 F.2d 161, 163 (10th Cir. 1987)). ALJ Vanderhoof's statement that "the record contains very few clinical findings which would substantiate significant back pain" does not justify the failure to consider Rocha's allegations. *See id.* ("'[T]he absence of an objective medical basis for the degree of severity of pain may affect the weight to be given to the claimant's subjective allegations of pain, but a lack of objective corroboration of the pain's severity cannot justify disregarding those allegations.'") (quoting *Luna*, 834 F.2d at 165).

ALJ Vanderhoof mentioned in passing that Rocha had been treated for her back symptoms on a regular basis and both ALJ Vanderhoof and ALJ Wurm noted that her treating physician had indicated that she was generally well. [AR 22, 429] But neither ALJ undertook the third step of the three-step pain analysis. Because the ALJs failed to apply the correct legal standards to Rocha's

---

[6] In *Thompson*, the court held that the following was sufficient objective evidence to satisfy the first two steps:

> On October 26, 1989, Dr. Chandler made a diagnosis of lumbar strain and possible herniated disc. His examination on that date revealed that Ms. Thompson experienced pain doing straight leg lifts, which increased when he flexed either of her feet. On both November 28 and December 12 1989, Dr. Nardone reported that Ms. Thompson's range of motion was restricted and that "[p]alpation reveals deep tenderness at L4-5" On December 22, 1989, Dr. Nardone reported that Ms. Thompson was "tender over the left paravertebral area."

987 F.2d at 1489 (citations to record omitted).

complaints of pain, this matter must be remanded for a reconsideration of Rocha's RFC.[7]

## DEMANDS OF PAST RELEVANT WORK

At the second phase of the step four analysis, the ALJ must make findings regarding the physical and mental demands of the claimant's past relevant work. *Winfrey*, 92 F.3d at 1024. The ALJ must develop a sufficient record to make these findings. *Id.* If the claimant has a mental impairment, the ALJ must take particular care to obtain a precise description of the particular job duties that may cause tension or anxiety (for example, speed and precision or working with other people) to determine whether the claimant's mental impairment is compatible with performing the work. *Id.* Rocha argues that the ALJ failed to make that particularized inquiry in this case.

After finding that Rocha "experiences moderate restrictions of her ability to adapt to work changes and tolerate work related stressors," ALJ Wurm stated:

> Vocational expert testimony establishes that the claimant has been able to return to her past relevant work as a motel maid during the period under review. The vocational expert gave her opinion that this work was exertionally light in nature, it did not involve working at heights or around hazardous conditions, and it was unskilled in nature and involved no stressful conditions. [AR 23]

The vocational expert testified that maid work was regarded as light, unskilled work and that

---

[7] Rocha also argues that the ALJ erred in discrediting her treating physician's RFC assessment. In determining how much weight to give a treating physician's opinion, the ALJ must first determine whether it is entitled to controlling weight by considering whether it is well supported by medical evidence and whether it is consistent with other substantial evidence in the record. *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004). If the ALJ determines that the treating physician's opinion fails to satisfy one of these conditions, the opinion is not entitled to controlling weight, but it is still entitled to deference and must be weighed using six factors. *See id.* Here, after finding Dr. Sava's opinion conclusory and inconsistent, ALJ Wurm simply stated that the opinion "was not helpful . . . and is not accorded significant weight herein." [AR 22] It thus appears that the ALJ did not apply the required six-factor analysis. On remand, the ALJ's decision should reflect that any treating physicians' opinions were properly analyzed.

Additionally, Rocha complains that the ALJ failed to consider her claims that she suffered from decreased energy. On remand, the ALJ should consider the effect of decreased energy on Rocha's RFC, if he finds these claims credible.

a person who could not work at heights or around hazards and who could only do occasional bending and stooping would be able to perform maid work. [AR 62-63] The following exchange then occurred between the ALJ and the VE:

> Q: Okay. If we assume those limitations and additional limitations as follows. Say a moderately limited ability to adapt to changes in a routine work setting. Would that change your answer?
>
> A: No, this type of work is reliably routine with very little variances in duties. Typically unskilled work, it's characterized by being very routine.

[AR 63]

Although the ALJ found that Rocha experiences moderate restrictions of her ability to tolerate work-related stressors and his decision states that the VE testified that maid work "involved no stressful conditions," the exchange quoted above reveals that the ALJ never asked, and the VE never testified about, whether maid work involved stressful conditions. The testimony was limited to whether a person who has a moderately limited ability to adapt to work changes could perform maid work. Therefore, there is no evidence to support the ALJ's finding that maid work involves no stressful conditions.

## CONCLUSION

Noting that this case has already been remanded twice by the Appeals Council, Rocha requests that I remand for an award of benefits rather than for another round of administrative proceedings. An outright award of benefits is not appropriate in this case. *See Williams v. Bowen*, 844 F.2d 748, 760 (10th Cir. 1988) (holding that outright reversal and remand for immediate award of benefits is appropriate when additional fact-finding would serve no useful purpose).

IT IS THEREFORE ORDERED that Rocha's Motion to Reverse and Remand for Payment of Benefits, or in the Alternative, for a Rehearing is granted in part. This matter is remanded to the

Commissioner for further proceedings consistent with this opinion.

     IT IS SO ORDERED.

                                                                           _____
                                                                           WILLIAM P. LYNCH
                                                                           UNITED STATES MAGISTRATE JUDGE